50                 October 8, 2025                 No. 869

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

SHANNON TURECK,
*Plaintiff-Appellant,*

*v.*

SUDEEP TAKSALI, M.D.,
an individual;
Jeffrey Knight, M.D.,
an individual;
and Willamette Orthopedic Group, LLC,
dba Hope Orthopedics of Oregon,
an assumed business name of
Hope Orthopedics of Oregon Foundation,
*Defendants-Respondents,*

*and*

HOPE ORTHOPEDICS OF OREGON FOUNDATION,
a domestic non-profit corporation, and Willamette Surgery
Center, LLC, an Oregon limited liability company,
*Defendants.*
Marion County Circuit Court
20CV03862; A179867

Erious C. Johnson, Jr., Judge.

Argued and submitted March 18, 2024.

R. Grant Cook argued the cause for appellant. Also on the briefs was Cook Law Firm.

Alice S. Newlin argued the cause for respondent Sudeep Taksali, M. D. Also on the brief were Jeffrey S. Young and Lindsay Hart, LLP.

Janelle W. Debes argued the cause for respondent Jeffrey M. Knight, M. D. Also on the brief were John E. Pollino and Garrett Hemann Robertson PC.

Travis A. Merritt argued the cause for respondent Willamette Orthopedic Group, LLC. Also on the brief were Thomas F. Armosino and Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P.C.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

In this medical negligence case, plaintiff appeals from a judgment for defendants after the trial court granted defendants' motion for summary judgment based on the statute of limitations in ORS 12.110(4), which generally requires that a medical malpractice claim be commenced "within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered." We conclude that the trial court did not err in granting defendants' motion and therefore affirm.

In an appeal of a grant of summary judgment, we review the facts and all reasonable inferences that may be drawn from them in favor of the nonmoving party, which is plaintiff in this case. *See, e.g.*, *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997); *Mouktabis v. Oregon City Police Dept.*, 337 Or App 226, 228, 563 P3d 1003 (2025). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. ORCP 47 C. We describe the underlying facts using our standard of review.

Plaintiff fell from a ladder and broke his right wrist. A doctor in Salem Hospital emergency department set and bandaged the wrist and advised plaintiff to see an orthopedist. Plaintiff saw defendant Dr. Taksali, an orthopedic surgeon at defendant Hope Orthopedics. Taksali advised plaintiff that his broken wrist bones were not aligned and recommended surgery. He referred plaintiff to Dr. Knight, also an orthopedic surgeon at Hope Orthopedics. Plaintiff and Taksali together met with Knight, who also recommended surgery. Knight performed surgery on plaintiff's wrist on February 2, 2017.

Plaintiff testified by deposition that before the surgery, the pain in his wrist was mild, but that when he came out of the surgery, despite having been told that there would be a painkilling "block," he was in "an enormous amount of pain," that the pain was "unbelievable," and that he had never experienced pain like that in his life. Plaintiff testified that he knew at that moment that things were "not

correct," and that he had suffered some "traumatic event" during the surgery.[1]

The pain that plaintiff experienced immediately after the surgery subsided after several days. At his first post-operative visit 10 days after the surgery, a physician assistant assured plaintiff that the surgery was a success and that his wrist was healing well. However, imaging at the six-week exam revealed that plaintiff had a collapsed lunate bone. Knight advised plaintiff that, to regain full use of his wrist, plaintiff needed a second surgery. Plaintiff agreed to the second surgery and began doing his own research on the Internet about a collapsed lunate.

Plaintiff testified in his deposition that when he woke up from the second surgery, he had no pain, which caused him to realize that something had gone wrong during the first surgery, when he had suffered extreme pain upon waking up.

At the first post-operative visit after the second surgery, plaintiff was again advised that the surgery was a success and that the wrist was healing well. At the six-week exam with Knight, plaintiff expressed concern that the wrist appeared to be deformed, but Knight assured him that the appearance of the wrist after a surgery like the one plaintiff had undergone was normal, that the wrist was healing well, and that plaintiff should "give it about a year" before he judged the success of his recovery. He testified that he told Knight, "Um, my wrist is clearly deformed, and I'm unhappy about it, you know, and I want to talk to you about it." According to plaintiff, he came out of the exam per-suaded by Knight that the deformity that he had observed was normal after a surgery and that nothing was wrong.

---

[1] Plaintiff testified:

"[E]verybody knows what a slice feels like. I can feel where I was sliced open. I can feel a feeling of like where the bones—like say somebody took a sledge hammer to it and it was smashed. That's pretty much the feeling I had of that part."

Plaintiff also testified that there were other indications of injury, including pain in his shoulder and pain and bruising in his neck. Plaintiff testified that he had very little finger movement for weeks after the surgery. Those symptoms led plaintiff to believe that maybe he had been dropped after the surgery but before he woke up. He also suspected that medical personnel overly medicated him after the surgery.

However, at a physical therapy appointment after the second surgery, in May 2017, the physical therapist commented that plaintiff's wrist was deformed and said that it would never be normal. Plaintiff testified that that was different from what he felt he had heard from Knight at Hope Orthopedics after the surgery and was the first time that he learned that things were less than perfect with his wrist. But through exercises and physical therapy, plaintiff regained strength in his wrist and felt that he was progressing well.

Several months after he completed physical therapy, plaintiff began to lose movement in his wrist. Plaintiff testified that, in the fall of 2017, he went to see his attorney about the possibility that he might have a claim and to obtain a referral for a consultation with a physician. Plaintiff testified, "I felt at that point there was a distinct possibility that I might have a claim, but there's no way I could know at this point that I have a claim. And I wanted to find out his opinion, maybe a recommendation." In the fall of 2017, feeling like his wrist was "in clear decline," plaintiff requested his medical records from defendants and made an appointment with an orthopedic surgeon at Oregon Health & Science University (OHSU). Plaintiff reviewed those records in late 2017, which he described as the fall of 2017, and determined from his review that the first surgery had been unnecessary.

In January 2018, plaintiff saw an OHSU orthopedic surgeon, who opined that plaintiff should not have had the first or second surgery, and that Knight "had failed to put the lunate in proper position." In February 2018, Dr. Orfaly, an orthopedic surgeon, performed fusion surgery on plaintiff's wrist and told plaintiff that, even with that surgery, plaintiff would have permanent disability in his wrist.

On January 18, 2020, plaintiff filed this lawsuit, asserting negligence by Knight, based on an alleged traumatic injury during or after the first surgery, negligence by Knight in the performance of the second surgery, negligence by Taksali in having recommended the first surgery and in failing to obtain plaintiff's informed consent, and negligence by Hope Orthopedics, as Knight's and Taksali's employer.

Defendants moved for summary judgment, arguing that under the statute of limitations in ORS 12.110(4), which requires that a medical malpractice claim be commenced "within two years from the date when the injury is first discovered or in the exercise of reasonable care should have been discovered," plaintiff's lawsuit was untimely. Defendants reasoned that plaintiff knew or had reason to believe that by April 2017—or certainly by the fall of 2017—he had been injured as a result of defendants' alleged tortious conduct, and therefore his action filed in January 2020 was untimely.

Plaintiff responded, among other arguments, that evidence of defendants' assurances after the first and second surgeries that plaintiff's wrist was healing correctly and to "give it a year," had prevented plaintiff from discovering legally cognizable harm, and that he did not discover legally cognizable harm until he visited the OHSU orthopedists in January and February 2018. Thus, in plaintiff's view, the trial court should have denied summary judgment because his claim was filed within two years of his discovery of that harm. Defendants replied that the record on summary judgment shows that, notwithstanding assurances by defendants, by April 2017 but no later than the fall of 2017, plaintiff believed that he had suffered cognizable harm by defendants.

The trial court agreed with defendants' contention and granted summary judgment. In its order, the trial court summarized *Gaston v. Parsons*, 318 Or 247, 255-56, 864 P2d 1319 (1994), which described the three "elements" that must be present before a person has discovered an "injury" for purposes of tolling the statute of limitations, ORS 12.110(4). Those "elements" are harm, causation, and tortious conduct. *Id*. As the court explained, a plaintiff has the necessary "quantum of awareness"—and therefore the statute of limitations begins to run—when the plaintiff knows or in the exercise of reasonable care should have known "facts which would make a reasonable person aware of a substantial possibility that each of the three elements *** exists." *Id*. at 256.

With respect to plaintiff's knowledge that he had been "harmed," the trial court cited plaintiff's deposition testimony that he became concerned that "things [were] not correct" when he woke up from his second surgery," thinking that "something didn't go well" in the first surgery. The trial court also cited plaintiff's testimony that, at physical therapy after the second surgery, plaintiff learned that his wrist would not return to normal, although he had been under the impression that he would have full use of the wrist after the second surgery.

With respect to plaintiff's knowledge that the harm he had experienced was tortious, the trial court cited plaintiff's deposition testimony that, by the fall of 2017, plaintiff had come to believe that the first surgery had been unnecessary. The trial court concluded that the record on summary judgment required the conclusion that, despite assurances by defendants that the surgeries were successful and that plaintiff's wrist was healing, by the fall of 2017, plaintiff knew or had reason to know facts that would make a reasonable person aware of a substantial possibility of harm, causation, and tortious conduct.[2] Thus, the trial court concluded, plaintiff had "discovered" his injury by the fall of 2017, and his claims against defendants were therefore untimely.

On appeal, plaintiff contends that the trial court erred in granting defendants' motion for summary judgment, asserting that the record on summary judgment gives rise to questions of material fact as to whether he reasonably could have known, before his exam by the OHSU orthopedic surgeon, of the harm that his lunate was not correctly placed by the second surgery. We disagree with plaintiff's argument. Viewing the facts in the summary judgment record and all reasonable inferences that may be drawn from them in favor of plaintiff, as the nonmoving party, we conclude that there is no evidence from which a reasonable factfinder could find that plaintiff's discovery of the alleged

---

[2] The trial court found that by the fall of 2017,

"[p]laintiff exercised reasonable care to uncover the facts that would make a reasonable person aware of a substantial possibility that harm, causation, and tortious conduct existed based on the first surgery performed on February 14, 2017."

tortious nature of his harm was delayed because of assurances by defendants. Accordingly, the trial court did not err in granting defendants' motion for summary judgment based on the determination that plaintiff's claims were filed outside of the statute of limitations.

As an initial matter, there is no requirement for purposes of ORS 12.110(4) that a plaintiff know the exact nature or full extent of the harm. Rather, it is sufficient for a plaintiff to know that some harm has occurred. *Clark v. Gilstrap*, 332 Or App 720, 723-24, 551 P3d 971 (2024) (observing that "there is no requirement that a plaintiff discover the full extent of their injuries" and that it is sufficient to know that some harm has been incurred and that a claim exists). Here, as the trial court concluded, the record on summary judgment and plaintiff's own testimony, described above, would require a reasonable factfinder to find that, by the time of the second surgery, but certainly not later than the fall of 2017, plaintiff knew that he had suffered harm.

To the extent that plaintiff contends that evidence of defendants' assurances that the two surgeries had been successful gave rise to a material question of fact as to when plaintiff knew or reasonably should have known that his harm was legally cognizable, *i.e.*, that defendants' conduct was tortious, we disagree with plaintiff's contention. Plaintiff correctly notes that the court in *Gaston* explained that assurances by a physician can bear on whether a patient discovers that an experienced harm was legally cognizable, *i.e.*, tortious. The court explained:

"Assurances made by the attending physician may also have a bearing on whether a reasonable person would be aware of a substantial possibility of tortious conduct. *See* [*Frohs v. Greene*, 253 Or 1, 6-7, 452 P2d 564 (1969)] (statements by physicians considered in assessing whether the plaintiff had discovered claim). A physician's assurances may be particularly influential on a plaintiff because the physician-patient relationship is 'a relationship of trust and confidence *** in which continued treatment or other resort to the skills of the defendant is required.' *Cavan v. General Motors*, 280 Or 455, 458, 571 P2d 1249 (1977). If the physician makes a representation on which a plaintiff reasonably relies, it could have the effect of delaying

a reasonable person from becoming aware of a substantial possibility of tortious conduct.”

*Gaston*, 318 Or at 257 (ellipses in original; footnote omitted). Importantly, any assurance must be one on which “a plaintiff reasonably relies” to have the delaying effect. *Id.* As the court explained, reliance on assurances can cause a plaintiff to delay discovery that a harm was tortious. The problem with plaintiff's argument in this case, however, is that he makes it in an evidentiary vacuum. Unlike in *Gaston*, here, if and to the extent that defendants made and plaintiff relied on assurances that the surgeries were successful and that his wrist was healing properly, by the fall of 2017, any reliance by plaintiff had vanished.[3] Moreover, there is no evidence in the record on summary judgment that, after the surgeries, plaintiff ever inquired—or defendants ever gave plaintiff assurances—about the necessity of the first surgery or whether plaintiff had suffered a trauma during the first surgery, which are bases for plaintiff's claims of negligence.[4] Thus, there is no evidence that plaintiff actually relied on

---

[3] In *Gaston*, the court concluded that the plaintiff had relied on the physician's assurances:

“A genuine issue of material fact exists in this case as to when plaintiff in the exercise of reasonable care should have discovered a substantial possibility of tortious conduct. Plaintiff's symptoms were not so clearly unrelated to the procedure performed that as a matter of law a reasonable person would believe that the cause was tortious conduct. In addition, Parsons assured plaintiff that the numbness and loss of use that plaintiff experienced in his left arm was temporary. The assurance raises a genuine issue of fact as to its effect upon a reasonable person. The fact that the assurance came after surgery, rather than before, did not put plaintiff on notice as a matter of law of tortious conduct. Nor can we say that plaintiff was, as a matter of law, unjustified in relying on Parsons's assurances. As this court stated in *Schiele v. Hobart Corporation*, 284 Or 483, 490, 587 P2d 1010 (1978), ‘[w]e cannot *** say as a matter of law that anyone who is optimistic about his condition's taking a turn for the better is unreasonable.’”

318 Or at 258 (ellipses in original; footnotes omitted).

[4] Indeed, plaintiff testified that he did not ask whether any trauma had occurred during the first surgery. The evidence cited by plaintiff as giving rise to a question of fact as to the effect of assurances is plaintiff's testimony about a conversation with Knight at his exam six weeks after the second surgery:

“What he told me was that what I was looking at is normal after a surgery. When you look at the surgery that I had been through, when you look at the accident that I had been through, when you look at the need for the revision surgery, you're going to have a wrist that looks a little different. The bones are placed correctly, the hand is going to heal just as you have been getting more strength, more movement, just as you've, you know not had pain, you're going to continue to go forward and it's going to continue to get better.”

assurances from defendants that could have delayed his discovery of defendants' alleged tortious conduct in performing the first or second surgeries as the legally cognizable cause of his alleged harm.

Indeed, plaintiff's own undisputed deposition testimony is that, by the fall of 2017, plaintiff believed that he had been harmed by defendants' negligence in the performance of the first surgery. Plaintiff argues that his lay assessment of negligence does not meet the "quantum of awareness" required by *Gaston*, or at least does not eliminate a question of fact as to whether plaintiff discovered defendants' negligence. We conclude otherwise. As the *Gaston* court explained, the required "quantum of awareness" is that the plaintiff knew or reasonably should have known "facts which would make a reasonable person aware of a substantial possibility that each of the three elements * * * exists." *Id.* at 256. Thus, the trial court correctly concluded that plaintiff's own deposition testimony—that he had concluded by the fall of 2017 that the first surgery had been unnecessary and that there was a "distinct possibility" that he had a claim—met the "quantum of awareness" standard, because they were facts that would make a reasonable person aware of a substantial possibility that the person had suffered cognizable harm.

Affirmed.